William D. Lydon and Myrtle I. Lydon v. Commissioner.Lydon v. CommissionerDocket No. 73581.United States Tax CourtT.C. Memo 1964-27; 1964 Tax Ct. Memo LEXIS 310; 23 T.C.M. (CCH) 135; T.C.M. (RIA) 64027; February 4, 1964*310 During the years 1953 through 1955 petitioner was a party to defalcations by the state auditor of Illinois and retained, but fraudulently failed to report as income, proceeds of checks issued to him in payment of fictitious invoices. Petitioner also received payments from a subcontractor which he fraudulently failed to report as income. Respondent's determination of the amount of petitioner's capital gain on the redemption of his corporate stock is sustained, although certain deductions are allowable to petitioner. Petitioner is entitled to deduct only part of expenses incurred in 1955. Petitioner is liable for the statutory additions to tax for fraud in all years involved and for the failure to file an estimated tax return in 1953 and 1954, upon the underpayments in question. Allan J. Smietanka and Joseph G. Smietanka, 105 W. Adams St., Chicago, Ill., for the petitioners. David H. Nelson, Donald J. Forman, and Joseph T. deNicola, for the respondent. TRAINMemorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in income tax and additions to tax in the years and amounts as follows: Addition underSec. 293(b)IRC 1939 andAddition underAddition underSec. 6653(b)Sec. 294(d)(1)(A)Sec. 294(d)(2)DeficiencyIRC 1954IRC 1939IRC 19391953$23,574.20$11,787.10$2,114.59$1,450.0119547,083.823,541.91673.09475.12195555,045.8127,522.9100*311 Respondent has conceded certain income items and the additions under section 294(d)(2). The principal issues which remain for decision are: (1) Whether petitioners received and retained proceeds of certain checks and warrants so as to constitute taxable income to them in the years in question; and (2) Whether all or part of any deficiencies in petitioners' returns were due to fraud with intent to evade taxes. Findings of Fact Petitioners William D. Lydon and Myrtle I. Lydon, his wife, during the years herein involved were residents of Chicago, Illinois. Petitioners' joint Federal income tax returns for the years 1953, 1954 and 1955 were filed with the district director of internal revenue in Chicago, Illinois. Myrtle I. Lydon is involved in this proceeding only because she filed a joint return with her husband. Unless otherwise stated, all references herein to "petitioner" or "Lydon" are to William D. Lydon. Some of the facts have been stipulated and are incorporated herein. In 1943 petitioner obtained a position with Mitchell-David Co., Inc., (hereinafter sometimes referred to as Mitchell-David). Prior to that time, he had been employed by several Chicago firms as a drapery cutter *312 and designer. Prior to the employment of petitioner, the business operation of Mitchell-David consisted primarily of providing an interior decorating service for decorators who brought their materials and fabrics to the Mitchell-David workroom to be sewn, fabricated and subsequently installed. Upon joining Mitchell-David, petitioner suggested that the company expand to include direct drapery contract sales with theaters, hotels, hospitals, churches and other large establishments. His services were retained to reorganize the business of Mitchell-David and to act as a salesman with respect to the above-mentioned types of accounts. By the years in issue, Lydon had risen to the position of president and was a member of the board of directors of Mitchell-David. When petitioner commenced work for Mitchell-David, the annual volume of gross receipts of the corporation was approximately $75,000. Petitioner procured substantial business for Mitchell-David from many large firms including department stores, theaters and hotels, and from the State of Illinois. As a result, the gross business of the corporation gradually and steadily increased until sales volume was approximately $460,000 when petitioner *313 left its employ in April of 1954. Petitioner met Orville Hodge for the first time in 1951 when Hodge was a member of the Illinois Legislature. Hodge was aware of Mitchell-David's excellent reputation in the decorating business and retained it to work on his home in Granite City, Illinois. In 1952 Hodge contracted with Lydon to renovate and refurnish the offices of his real estate and insurance firm. Hodge was nominated and elected to the office of Auditor of Public Accounts in the State of Illinois in November 1952. Following the election, Hodge hired Lydon to remodel his suite at the Abe Lincoln Hotel in Springfield, Illinois. Hodge was sworn in as auditor in January 1953. After Hodge took office, Lydon also commenced work on a suite of rooms rented by Hodge at the Drake Hotel in Chicago, Illinois. One of the chief functions of the state auditor's office was to prepare and issue warrants (checks) for all merchandise purchased and services performed for the State of Illinois. Approximately 35,000 such warrants were issued every month. When Hodge took office in January of 1953, he discovered that the warrants were prepared by hand and that the entire system of bookkeeping and accounting *314 entries was antiquated, causing much delay and unnecessary expense. In order to streamline this system, Hodge undertook to install modern machinery. To this end, in March 1953, he employed Edward Epping (hereinafter sometimes referred to as Epping), a certified public accountant. The auditor's office, which Hodge directed, performed a variety of supervisory tasks including the examination and audit of many state agencies. In addition to the office in Springfield, the auditor maintained a large branch office in Chicago at 188 W. Randolph Street, occupying the entire 7th and 8th floors. When Hodge took office, the 7th floor was one large open room. In order to increase the comfort and efficiency of the employees of the many state departments, Hodge proposed subdividing this area and installing air conditioning and modern lighting. Similar suggestions were made for the 8th floor which consisted of two rooms. After being sworn in as state auditor in January 1953, Hodge informed Lydon of his intention to have the 188 W. Randolph Street offices remodeled and refurnished. He requested Lydon to make a survey and propose plans which would fit the particular needs of the employees at the offices. *315 Lydon undertook this survey, met with the department heads involved, and drew up plans within two or three months. There was never any bid or written contract for the work to be performed, merely an oral agreement between Hodge and Lydon that Mitchell-David was to be paid "cost plus ten percent." Work was authorized on the basis of estimates made by petitioner at various planning conferences attended by the department heads and on occasion by Hodge. During the year 1953 and until petitioner left in 1954, the stockholders and officers of Mitchell-David and the total number of shares held by each were as follows: NameNo. of SharesOfficePetitioner2058-23/26President - DirectorTheodore E. Dahlfors2058-23/26Vice-President - DirectorDavid D. Dahlfors926-11/13DirectorAnne H. Karpus196- 7/13Secretary-Treasurer - DirectorTotal issued and outstanding5241- 2/13As president, petitioner procured business for Mitchell-David, did all of the purchasing, and conducted the general operations of the business. Petitioner was the only person connected with Mitchell-David who conferred with Hodge or any state representative regarding the work at 188 W. Randolph Street. From time to time Lydon explained *316 to Theodore E. Dahlfors (hereinafter referred to as Dahlfors), the vice president, that Mitchell-David was doing work at 188 W. Randolph Street (hereinafter sometimes referred to as "the 188 job") but Dahlfors had no other knowledge, understanding of, or contact with the work being done by Mitchell-David for the State of Illinois. During the period in question, payment for services performed for the State of Illinois was made by the issuance, through the auditor's office, of state warrants. The procedure involved in the issuance of these warrants required multiple operations and was usually done over the course of several days after an invoice had been received from the payee. An advance payment, in the form of a warrant, could be issued from the state auditor's office in Springfield, Illinois, through a system known as a "rush warrant." The purpose of the rush warrant was to accelerate a payment by the State of Illinois to a named payee. It was in the normal course of business of the state auditor's office to issue an advance payment through the rush warrant system. In every case where a rush warrant was issued, the warrant number would be written on the face of the voucher by hand *317 and a rush warrant could be issued within an hour. The first Mitchell-David sales to the state auditor's office occurred early in 1953. Beginning in February 1953, Mitchell-David invoices were paid by the issuance of state warrants. The usual Mitchell-David bookkeeping procedure for these warrants was to record them in the cash receipts journal and credit the amount to sales in the sales journal. This was the procedure followed for the first seven warrants, with the exception of one which was used to defray an expense. Mitchell-David usually kept its books on a job basis. Harold E. Carlson, the firm's accountant, was told by petitioner to set up a special account on the general ledger to record receipts and disbursements on the 188 job so that it would reflect net profit from the job itself. The procedure was that when a warrant was received from the state and entered in the receipts journal by deposit, the 188 job account was credited with the amount. The account was charged with invoices covering the payments made by Mitchell-David for materials which went into the job. Most of the work done on the 188 job was paid for by advance payments as the work progressed through rush warrants *318 issued by the state at petitioner's request and without the submission of an invoice. On May 25, 1953, the State of Illinois issued three warrants to Mitchell-David in the amounts of $4,000, $2,000 and $4,000. These warrants were endorsed and cashed on May 26 by petitioner at the Southmoor Bank & Trust Co. (hereinafter referred to as Southmoor), located on the south side of Chicago, and were not taken into income by Mitchell-David. The disposition of the proceeds of these three warrants is in issue here. During each of the years here involved, Edward A. Hintz (hereinafter sometimes referred to as Hintz) was a vice president at Southmoor. Hintz was introduced to Lydon by Hodge sometime in 1953 during the progress of the 188 job. The first time that Hintz transacted any business with Lydon was on May 26, 1953, when Lydon went to Southmoor with the above three state warrants and requested Hintz to cash them. Hintz had some question about cashing checks payable to Mitchell-David and asked petitioner to furnish written authority from the corporation to cash such checks. On or about May 27, 1953, petitioner furnished Hintz with a printed form authorizing payment out of its funds upon checks *319 issued by the corporation and signed by the president. This certificate was filed and kept in the regular course of business at Southmoor. Dahlfors signed the authorization in order to make it easier for petitioner to cash checks issued by Mitchell-David near petitioner's home rather than downtown. Mitchell-David had no account at Southmoor; Lydon's use of Southmoor to cash state warrants was the only Mitchell-David business transacted there. On July 10, 1953, the state issued two warrants payable to Mitchell-David in the amounts of $10,000 and $35,585. The latter was deposited in the Mitchell-David account on July 12 but the former was endorsed and cashed by petitioner at Southmoor on July 13 and was not taken into income by Mitchell-David. The disposition of the proceeds of this warrant is in issue. On August 13, 1953, the state issued two warrants in the amounts of $15,000 and $5,000. The former was deposited to Mitchell-David's account on August 18. The latter was endorsed and cashed on August 14 by petitioner at Southmoor and was not taken into income by Mitchell-David. The disposition of the proceeds of this warrant is in issue. The next warrant cashed by petitioner at Southmoor *320 and not taken into income by Mitchell-David was one of three warrants issued to Mitchell-David on October 28, 1953. The three warrants were in the amounts of $10,000, $5,000 and $15,232.48. 1 The disposition of the proceeds of the $5,000 warrant is in issue. The last two state warrants payable to Mitchell-David in 1953 were issued on December 22, 1953, in the amounts of $2,606.01 and $2,411.28. These were endorsed and cashed by petitioner at Southmoor on December 24, 1953, and were not reported in income by Mitchell-David. The disposition of the proceeds from both of these warrants is in issue. A summary of all state warrants issued to Mitchell-David during 1953 is as follows: IssuedAmount2-13-53$ 3,464.442-18-53764.003-13-53721.953-13-53648.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,000.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,367.675-11-531,115.675-25-534,000.00 *5-25-532,000.00 *5-25-534,000.00 *7-10-5310,000.00 *7-10-5335,585.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,000.008-13-535,000.00 *9-15-5337,500.009-15-532,500.009-29-531,763.6210-13-535,180.0010-28-5310,000.0010-28-535,000.00 *10-28-5315,232.4812-22-532,606.01 *12-22-532,411.28 *Totals$192,860.62*321 The eight warrants in issue were endorsed and presented by petitioner or his agent to Hintz at Southmoor for cashing in 1953. Hintz initialed each of the warrants, cashed them, and handed the proceeds over to petitioner. Petitioner was one of the organizers of "Interiors for Living" (hereinafter referred to as "Interiors"), a corporation which represented various manufacturers and distributors and which had display space in the Merchandise Mart Building in Chicago. Harold H. Crost (hereinafter sometimes referred to as Crost) was an architect and contractor associated with his father in S. L. Crost Construction Company (hereinafter referred to as the Crost Company) in 1953, 1954 and 1955. In 1953 this company did remodeling and alteration work for Interiors at the request of the petitioner. Prior to that time the company had done work for Interiors at the request of petitioner on two or three occasions. Its 1953 work for Interiors started in March and ended in May. The Crost company issued an invoice dated July 18, 1953, for the 1953 work for Interiors, in the amount of $4,537. This recited that $3,000 had been received on account and that $1,537 was still due. *322 Interiors' cash disbursement journal, kept in the regular course of business, reflected payments of $1,000 each on March 24, May 1, May 12, and July 28, 1953, and a payment of $537 on April 23, 1954. These were the only payments to Crost or the Crost company reflected in the Leasehold Improvement account of Interiors in 1953 and 1954. These checks were issued in payment of the Crost company invoice of July 18, 1953. The March and July 1953 checks were deposited in the Crost company account at Amalgamated Trust and Savings Bank (hereinafter sometimes referred to as Amalgamated). The two May 1953 checks were given to Crost by petitioner at the same time and were cashed at Lake Shore National Bank by Crost on May 15, 1953, at the petitioner's request. Crost turned back to petitioner the proceeds of all checks which he had cashed at the petitioner's request. At about the same time petitioner gave Crost a Mitchell-David check for $2,000 which he regarded as payment for the Interiors job. This was deposited to the Crost company account at Amalgamated on May 18, 1953. The deposit slip used by Crost reflected that this amount represented a payment from Interiors. In 1953 the Crost company *323 did remodeling work on the 188 job for Mitchell-David at Lydon's request. Its remodeling job for Interiors in 1953 was completed before it started work on the 188 job in late June 1953. On an undisclosed date, Lydon went to Crost's office to instruct Crost how he wanted the invoices made out for the 188 job. Petitioner wrote out in his own handwriting on a sheet of notebook paper the sums which he wanted Crost to charge Mitchell-David. One set of figures indicated a base price of $32,185 plus extras of $684.31 for a total of $32,869.31, and was entitled "Bet. Harold [Crost] & Lydon." Another set of figures entitled "Original" listed a base price of $35,585 plus extras of $2,077.23 for a total of $37,662.23. Both sets of figures were higher than Crost's original bid to Mitchell-David. The Crost company submitted two bids under the date of May 23, 1953, to Mitchell-David for the work proposed on the 188 job. These bids corresponded to the figures suggested by Lydon. The total amount of checks issued by Mitchell-David for the 188 job in 1953 was $38,887.23. These were separate from the Interiors checks issued to Crost or the Crost company for previous work. Lydon personally handed Crost *324 checks from the various concerns with which Lydon was associated in payment for work done by the Crost company. These checks were made out either to Crost or to the Crost company. Crost never requested that Lydon make out these checks to any specific payee. On July 13, 1953, petitioner gave Crost the following Mitchell-David checks: CheckDate ofNo.PayeeAmountCheck11007Crost company$10,0007-13-5311008Crost1,6007-13-53 Petitioner asked Crost to cash check No. 11008 and turn the proceeds back to him, which Crost did. The other check was deposited by Crost at Amalgamated. The disposition of the proceeds of the $1,600 check is in issue. On July 27, 1953, Mitchell-David issued its check for $2,000 to Crost. Crost cashed this the next day and turned the proceeds over to petitioner at petitioner's request. On October 29, 1955, petitioner gave Crost the following Mitchell-David checks: CheckDate ofNo.PayeeAmountCheck11629Crost company$9,985.0010-29-5311630Crost company2,077.2310-29-53 On November 2, 1953, Crost cashed check No. 11630 and turned over the proceeds to petitioner. Crost deposited the other check in the Crost company account at Amalgamated. The disposition of the proceeds of the *325 $2,077.23 check is in issue. On December 1, Mitchell-David issued its check No. 11785 payable to Crost in the amount of $1,000. This was cashed by Crost on the same day at Lake Shore National Bank and the proceeds turned back to petitioner at the petitioner's request. The disposition of the proceeds of this $1,000 check is in issue. Crost cashed the foregoing checks as an accommodation to petitioner. He never asked petitioner to issue these checks in the manner in which they were issued and did not consider the proceeds of these checks as being for work done. Amounts which Crost turned back to Lydon were not deposited to the Crost company account. Only the amounts which he received and deposited to the Crost company account were considered by him to have been for services performed. Two other Mitchell-David checks were issued to the Crost company in 1954 but are not in issue here. Mitchell-David was an accrual basis taxpayer. The daily bookkeeping at Mitchell-David was done by Anne Karpus. All monthly posting, balancing and other bookkeeping adjustments were done by Harold E. Carlson, an outside accountant (hereinafter sometimes referred to as Carlson), who was also petitioner's personal *326 accountant in the years herein involved. During 1953 and 1954 Anne Karpus generally made all original journal entries. She recorded all state warrants payable to Mitchell-David which were given to her by petitioner, endorsed them with a rubber stamp and deposited them in Mitchell-David's bank account. These were all properly recorded in Mitchell-David's income tax returns. Neither Carlson nor Anne Karpus was ever advised of the eight state warrants payable to Mitchell-David which were cashed by Lydon; nor did Dahlfors have any knowledge that Lydon cashed these warrants. Petitioner became a patrolman on the police department of the city of Chicago in 1938. He worked in the evenings for the police department and during the day for Mitchell-David. Under police department regulations a police officer was forbidden to hold another job. Lydon was dismissed in 1956 for violation of these regulations. For the years 1953, 1954 and 1955 Lydon reported income from the police department of $4,500, $4,724.88 and $4,924.80. In 1953 petitioner received $10,400 as salary from Mitchell-David. On January 13, 1954, the state issued a warrant in the amount of $2,000 payable to Mitchell-David. Respondent *327 has conceded on brief that he erred in determining that proceeds of this warrant constituted taxable income to petitioner. On March 24, 1954, the state issued a $504.34 warrant to Mitchell-David. Petitioner endorsed and cashed this warrant at Southmoor on March 26, 1954, but the proceeds were not taken into income by Mitchell-David. The disposition of the proceeds of this warrant is in issue. On April 29, 1954, Mitchell-David issued a check to "Currency" in the amount of $236.40. This check was endorsed and cashed by petitioner at Southmoor on May 5, 1954, and not taken into his income for 1954. The disposition of the proceeds of this check is in issue. In the latter part of January or early part of February 1954 petitioner and Dahlfors had a meeting with respect to Mitchell-David's past year's business and proposals for the coming year. Dahlfors said he felt petitioner was spending too much time not in the interest of Mitchell-David and that he felt it would be in the best interests of the company if petitioner resigned. On March 31, 1954, petitioner tendered his resignation as president and as a director of Mitchell-David, effective as of April 30, 1954. This resignation was accepted *328 unanimously at a special meeting of the shareholders and directors. In connection with petitioner's resignation, Mitchell-David agreed to redeem the 2058-23/26 shares of its stock held by petitioner. The negotiated sale price was $25,000 cash plus an Oldsmobile automobile and various accounts receivable. In 1954 petitioner received approximately $9,000 of this amount plus the automobile, which was worth $2,100. After petitioner's departure from Mitchell-David, the company suffered financial difficulties, became insolvent, and executed an assignment for the benefit of creditors. Because of the company's insolvency, petitioner was required in 1955 to pay $2,000 as a personal guarantor of Mitchell-David's obligation on an Interiors lease at the Merchandise Mart. Ultimately, petitioner received an additional $9,725 in payment of his remaining claim. To collect this amount he paid $565 in attorney's fees. In his 1954 income tax return, petitioner reported the cost of his stock as $19,410 and the contract price as $25,000, for a gain of $5,590, of which he claimed $1,677 as income from an installment sale. In the statutory notice of deficiency respondent determined additional capital gain *329 to petitioner with respect to this transaction as follows: Selling price of stock$31,446.84Cost5,465.00Gain$25,981.84Gain reported1,677.00Difference$24,304.84Less 50 percent deduction under sec-tion 1202 of 1954 Code$12,152.42Understatement of Capital Gain$12,152.42After petitioner left Mitchell-David, he engaged in a similar type of business as a sole proprietor under the name of Fabric-Crafts Sales Company (hereinafter referred to as Fabric-Crafts). On March 15, 1954, petitioner opened a commercial checking account at Southmoor in the name of Fabric-Crafts. Carlson set up Fabric-Crafts' books for petitioner. He was still retained by Mitchell-David at this time. Lydon posted the journal and daily entries in the Fabric Crafts' books while Carlson reconciled the bank account quarterly, posted items from the general journal to the ledger charts, prepared quarterly and year-end financial statements, and adjusted entries at the end of the year. Fabric-Crafts' books were kept on a cash basis. Fabric-Crafts performed services and furnished merchandise to the State of Illinois in 1954, payments for which were made by warrants issued to Fabric-Crafts. Only those warrants which were recorded *330 on the books of Fabric-Crafts were taken into income by petitioner. The State of Illinois issued the following warrants to Fabric-Crafts in 1954; March 30, $8,000; June 29, $2,500; and July 15, $4,169.50. The second of these warrants was endorsed and cashed by petitioner but was not recorded on the books of Fabric-Crafts or taken into petitioner's 1954 income. The disposition of the proceeds of the warrant is in issue here. On July 18, 1954, Fabric-Crafts issued a check in the amount of $3,950 payable to Crost. Crost endorsed this check, cashed it and turned back $2,150 of the proceeds to petitioner, at petitioner's request. The balance of the proceeds ($1,800) was deposited by Crost in the Crost company checking account at Amalgamated and was regarded by Crost as payment for work done for Fabric-Crafts. The receipt by Lydon of the $2,150 is in issue. On January 17, 1955, Fabric-Crafts issued its invoice to the state in the amount of $441.92 for the repair of a davenport in Hodge's private office at 188 W. Randolph Street. On January 20, 1955, the state issued a $441.92 warant for "equipment" to pay for these repairs. Lydon endorsed and cashed this warrant on the same date but did *331 not report the proceeds as income. The disposition of the proceeds is in issue. On May 19, 1955, the state issued a warrant for "improvements" in the amount of $27,500. Respondent has conceded that petitioner did not receive the proceeds of this warrant and it is no longer in issue in this case. Because Hodge wanted to have a bank account in Chicago, he opened a checking account at Southmoor in December 1953. Funds in this checking account came from Hodge's salary and travel reimbursement checks from the state, interest payments on money owed to Hodge, and from Hodge's business ventures. Hintz personally maintained this account for Hodge at Southmoor, but it was not maintained according to customary banking procedures. This account was kept on regular bank ledger sheets but instead of entries being made by machine, they were personally entered by Hintz in his own hand. Hintz recorded all receipts and disbursements with regard to this memorandum account. The funds contained in this memorandum account were withdrawn from time to time but the manner of these withdrawals was varied. Some checks would come to Southmoor through the clearinghouse. In other instances Hodge would call Hintz *332 and advise him that Epping or some other messenger would stop to pick up some money. In July 1956, there was a scandal involving defalcations from the state treasury by Hodge and others. In the newspaper reports of the transactions involved, Hodge's memorandum checking account became known as the "brown envelope account" because of the fact that the ledger sheets were kept in a brown envelope by Hintz. In 1955 Hodge contemplated rehabilitating and consolidating the auditor's offices in the state capitol building at Springfield, Illinois. Lydon performed work on this job. On July 12, 1955, Fabric-Crafts issued an invoice to Hodge for $35,000, for which the state issued a warrant in that amount to Fabric-Crafts on July 13, 1955. This warrant was endorsed by typewriter at Hintz's direction as follows: For the deposit and credit of Fabric-Crafts Sales Company Hintz prepared a deposit slip in the name of Fabric-Crafts and caused $15,000 to be deposited and credited to the account of Fabric-Crafts at Southmoor. He credited the remaining $20,000 to the Hodge checking (brown envelope) account. This warrant has been characterized by respondent as a "split" warrant, since part of the proceeds *333 went to petitioner as payee and part went into the brown envelope account. Petitioner took the $15,000 into income and there is no issue here as to any part of the warrant. The next two state warrants, payable to Fabric-Crafts in amounts of $27,500 and $50,000, were issued on September 12 and October 13, 1955, respectively. Petitioner was originally charged with income only from the latter. Respondent has now conceded that this determination was incorrect, so that neither amount is now in issue. On November 21, November 28 and December 16, 1955, the state issued warrants in the amounts of $36,000, $26,239.84, and $30,000. These were endorsed by or at the direction of Hintz for deposit in Fabric-Crafts' account at Southmoor. These warrants were "split" by Hintz, $21,000 and $7,500 being taken from the first two deposits and put into the brown envelope account at Southmoor. Hintz also took $5,000 from the $30,000 deposit and paid it over to petitioner, who did not take this amount into income. Only this last $5,000 amount is in issue here. On October 10, 1955, Fabric-Crafts issued a check payable to Crost in the amount of $1,979.82. Crost cashed this check, deposited $1,279.82 of the *334 proceeds to his account, and handed petitioner back $700. Crost's deposit slip bore a notation that Fabric-Crafts was the source of the money and that the $1,279.82 was arrived at by deducting $700 from $1,979.82. Several of Crost's other deposit slips bore similar notations. After cashing the above check and giving $700 of the proceeds to petitioner, Crost received a Fabric-Crafts check from petitioner for $700. He deposited this to his account. Crost had performed services for $1,979.82 and understood that the additional $700 was added to enable Lydon to issue a bigger invoice. Both of these checks were charged to expenses by Fabric-Crafts and deducted on petitioner's 1955 return. The disposition of the $700 from the first check is in issue here. On December 12, 1955, petitioner issued Fabric-Crafts checks for $4,000 and $3,800. On December 19, 1955, Crost cashed the $3,800 check and turned the proceeds back to petitioner. He deposited the $4,000 check in the Crost company checking account. The cash disbursement journal of Fabric-Crafts reflects the amount of both these checks as being charged to merchandise expense and both were deducted on petitioner's 1955 return. The disposition *335 of the proceeds of the $3,800 check is in issue. Early in the summer of 1955, petitioner traveled to California on business for Interiors, taking his family with him. The amount of expenditures allocable to business expenses for this trip was $656, as claimed by petitioner on his 1955 income tax return under "other business deductions". Respondent disallowed $3,293.96 of the amount claimed by petitioner as "other business deductions" on his 1955 income tax return, on the ground, that they were not ordinary and necessary business expenses. Respondent also determined that $281.24, received by petitioner from Mitchell-David in 1955 pursuant to the contract of sale for petitioner's stock, should have been included by petitioner as interest income in 1955. After the Hodge scandal broke in July 1956, petitioner went to Crost's office and requested that Crost include in his income tax returns the amounts which Crost had turned over to petitioner. Petitioner told Crost that if these amounts were not included in Crost's income, petitioner would be obliged to say that he never received the proceeds of the checks which Crost cashed for the petitioner. Petitioner made arrangements for his bookkeeper, *336 Carlson, to go to Crost's office, and approximately a month later Carlson went there with a list of checks that petitioner had issued to Crost, and which petitioner wanted Crost to include in his income tax return. To further induce Crost to comply, petitioner called Crost's wife on the telephone and suggested that it would be better to follow his advice since he would otherwise deny receipt of any money from Crost. In the summer of 1956 the newspapers carried stories of irregularities in transactions emanating from the state auditor's office. The assistant state's attorney asked Hodge to produce copies of contracts and invoices relating to the 1955 work at the state capitol. Hodge called a meeting at the St. Nicholas Hotel in Springfield which was attended by petitioner, his lawyer, Epping and Hodge. Others from Hodge's office were also present. Hodge was trying to reconcile the Fabric-Crafts checks and to establish invoices to back up checks which had been issued fictitiously. Hodge and Epping asked petitioner if he would prepare invoices to support the vouchers and warrants which had been fictitiously issued to Fabric-Crafts. Lydon and his lawyer conferred in another room and they *337 proposed that they would prepare the necessary invoices, vouchers and contracts so that everything would correspond to the fictitious warrants, for the sum of $50,000. The necessary invoices and contracts were prepared in the hotel room and were later delivered to the assistant state's attorney. Hodge gave the agreed $50,000 to Epping who transmitted it to petitioner. This $50,000 was put by Lydon in a safe deposit box at Southmoor. It was later seized by the state and held subject to the order of the Circuit Court of Cook County. This sum is not in issue. During the May 1956 term of the Sangamon County Circuit Court of Illinois, Hodge was indicted of unlawfully obtaining from the state, through some 52 warrants, approximately $600,000. After the scandal broke in 1956, Hodge became extremely ill; he developed bleeding ulcers and was put under sedation and doctor's care. Because of his physical condition, Hodge's attorney advised him to plead guilty to any transactions which he did not have documentary evidence to categorically disprove. Hodge accepted this advice since he believed that the length of his sentence would not be materially increased because of additional transactions. *338 Some of the counts to which Hodge pleaded guilty involve the transactions here in dispute. On August 20, 1956, Hodge pleaded guilty to each and every count in the indictments, and was sentenced to the state penitentiary for a 12- to 15-year term. In the September 1956 term of the same court, Lydon was indicted on seven separate accounts of conspiring with Hodge, Epping and Hintz to obtain money from the treasury of the State of Illinois by false pretenses. On November 23, 1957, a jury in that court returned a verdict of guilty against Lydon and fixed his punishment as a $2,000 fine. In the September 1961 term of the District Court of the United States for the Northern District of Illinois, Eastern Division, petitioner was acquitted after a jury trial on charges of criminal tax evasion for the years 1953, 1954, and 1955. Petitioner received and retained the proceeds of the state warrants which he cashed, and of the "kick backs" he obtained from Crost. These amounts constituted taxable income to him in the years in question. The deficiencies resulting from petitioners' failure to report this income were due to fraud with intent to evade tax; the 50 percent addition to tax for fraud was *339 properly imposed. Opinion For purposes of clarity, we will consider the dealings which Lydon had with Hodge separately from those which he had with Crost. Lydon with Hodge There is no dispute that the State of Illinois was overcharged for services rendered by Mitchell-David and Fabric-Crafts. Moreover, respondent has established to our complete satisfaction that Lydon endorsed and cashed the state warrants in question and was in possession of theproceeds. Petitioner would have us believe that he was acting as an innocent instrumentality for Hodge in the latter's extensive defalcations. Petitioner claims that he was taken in by Hodge's explanation that such funds were to be used by Hodge to pay other contractors for whom the legislature had not yet appropriated money. Petitioner says that he was awed by Hodge's high office and felt unable to question Hodge's story. Petitioner maintains that he was unaware of any illegality in his dealings with Hodge until the Hodge scandal broke in the summer of 1956. He alleges that the $50,000 in cash paid to him by Hodge after the scandal was paid in order to indemnify him against any amounts he might have been forced to pay back to the state. Thus, *340 Lydon attempts to picture himself as caught in the massive web of Hodge's illicit dealings, and then seeks to find refuge in Hodge's convictions. He would have us believe that he was completely taken in by Hodge and received no substantial personal benefits from dealings with the auditor's office. Scrutiny of the facts exposes the transparency of petitioner's version of the transactions. The burden of proof in respect to the issue of fraud is on the respondent. Section 7454, Internal Revenue Code of 1954; section 1112, Internal Revenue Code of 1939. He must show fraud by clear and convincing evidence. M. Rea Gano, 19 B.T.A. 518, 533 (1930); W. A. Shaw, 27 T.C. 561, 569 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958). Respondent has conceded that the proceeds of some warrants issued to Mitchell-David were turned over by Lydon to Hodge via the brown envelope. However, respondent has established that the proceeds in dispute here went into Lydon's pocket, not into Hodge's brown envelope. Petitioner's contention that he turned over all of these proceeds to Hodge simply is not credible; nor is there a scintilla of evidence in the record which would accord with the contention. We do not believe *341 that petitioner could have raised the amounts on the Mitchell-David invoices without the knowledge and at least partial consent of Hodge and his associates. The usual scrutiny of invoices by the auditor's office would have prevented Lydon from carrying out this scheme alone. That Hodge would have permitted the practice without receiving a substantial quid pro quo is extremely doubtful. Likewise, Lydon was not a novice in the business world, and it is simply not credible that he was a mere ignorant and innocent pawn of Hodge who received none of the illicit funds. It is significant to note that the remodeling contract for the state jobs was an oral one between Lydon and Hodge. This circumstance, alone, indicates a considerable degree of close collaboration between these parties on a legitimate level, which appears also to characterize the parties' illegal dealings. The ease with which Lydon received payment for his work through the issuance of rush warrants, some of which did not even have invoices, was in marked contrast to the usual, slow procedure of the auditor's office. Similarly, Lydon was able to cash state warrants payable to Mitchell-David with relatively little difficulty *342 since Hodge had arranged in advance with Hintz to have this done. Lydon was only required to get a Mitchell-David corporate resolution permitting him to cash checks at Southmoor. Although this authorization covered only checks issued by Mitchell-David, Lydon was permitted to cash warrants payable to Mitchell-David. Thus, he could divert funds before anyone else at Mitchell-David became aware of their existence. Therefore, what was intended by the corporation to be simply for Lydon's convenience in cashing checks for corporate expenses became the vehicle for Lydon's diversion of funds payable to the corporation, and was facilitited by Lydon's close relationship with Hodge and its attendant benefits. After his association with Hodge began, petitioner started to spend much of his time attending to the various state jobs. He traveled extensively and performed many services for Hodge. Petitioner handled almost all phases of the state jobs by himself without keeping Dahlfors or anyone else at Mitchell-David informed of the transactions. Petitioner's less than total dedication to the corporation, and the amount of time Dahlfors felt petitioner was spending other than in the corporation's *343 best interest, led to petitioner's leaving Mitchell-David. His relationship with the firm was strained despite the corporate expansion achieved during his tenure as president and director. Petitioner went into business for himself as a sole proprietor and continued his dealings with Hodge and Hintz. He continued to submit raised invoices to the state and to allow Hintz to siphon off portions of the payments received into the brown envelope account. Thus, Hodge benefited from his share of the "split" warrants, and petitioner was able to divert cash from other warrants without taking them into income. It was a mutually beneficial arrangement. Petitioner also contends that the conviction of Hodge plus the acquittal of petitioner in earlier criminal proceedings collaterally estops respondent in this action. Petitioner reasons that since Hodge pleaded guilty to receipt of many of the items whose disposition is disputed here, that petitioner cannot be found to have received these same items. Petitioner overlooks the fact that respondent was not a party to the earlier proceedings and thus cannot be collaterally estopped in the instant case. Moreover, the issues raised in the two proceedings *344 are not dependent upon the same set of relevant facts, nor is the standard of proof indentical in the criminal cases and the instant case. Helvering v. Mitchell, 303 U.S. 391 (1938); Russell C. Manch, 35 B.T.A. 617 (1937), affd. 113 F. 2d 555 (C.A. 3, 1940). Even under the principle of stare decisis, we accord small weight in the instant case to Hodge's plea of guilty to receipt of proceeds whose disposition is disputed here. Following the discovery of his defalcations from the state treasury, Hodge accepted his attorney's advice and pleaded guilty to all transactions he could not categorically disprove, in order to avoid lengthy proceedings which might have further impaired his ill health. There was no trial on the merits on these issues. We are persuaded that Hodge's guilty plea was entered, in large part, because of his ill health and the effort which he would have had to expend to disprove the allegations made. Hodge also felt that his sentence would not be any shorter because of the noninclusion of the items which respondent now contends were received by Lydon. A witness such as Hodge can explain the circumstances underlying an earlier plea of guilty in a criminal tax evasion *345 case. This explanation plus Hodge's other testimony before us greatly diminish the persuasiveness of petitioner's contentions. Because we find that petitioner received the proceeds of the inflated warrants in issue and should have included them in his income, we also find that he has underpaid his income taxes for the years in question. Neither section 293(b) of the 1939 Code nor section 6653(b) of the 1954 Code requires that all of the underpayment be due to fraud with intent to evade taxes. It is sufficient that petitioner, with fraudulent intent, failed to report any part of the income giving rise to the deficiency. See e.g. Frank Imburgia, 22 T.C. 1002 (1954). Petitioner does not claim that he reported any of the proceeds of the state warrants in issue. Nor does he contend that his failure to report these items was due to mistake. See also Charles Oran Mensik, 37 T.C. 703, 752-3 (1962). He contends that he was merely an accommodation endorser for Hodge, and made no claim of right to the proceeds. The facts clearly refute this claim. We find that petitioner's failure to report this income was due to fraud since these proceeds were taxable income. That the income was reportable *346 should have been obvious to petitioner. Whether or not the proceeds were for services rendered, petitioner received gross income both under section 22(a) of the 1939 Code and 61(a) of the 1954 Code. It is equally well settled that, as the Supreme Court said in Rutkin v. United States, 343 U.S. 130 (1952) at p. 137. An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it. Burnet v. Wells, 289 U.S. 670, 678; Corliss v. Bowers, 281 U.S. 376, 378. That occurs when cash, as here, is delivered by its owner to the taxpayer in a manner which allows the recipient freedom to dispose of it at will even though it may have been obtained by fraud and his freedom to use it may be assailable by someone with a better title to it. Thus petitioner cannot find refuge in the fact that this illegally obtained money would have to be repaid. He has received the money, is taxable upon it, and has failed to report it. Petitioner has attempted to evade the tax laws by his dealings, and he is liable for the fraud penalties imposed by those laws. Respondent determined *347 additions to tax for 1953 and 1954 under section 294(d)(1)(A), 2*348 Internal Revenue Code of 1939, for the failure by petitioner to file declarations of estimated tax. Petitioner has introduced no evidence to show that such failure was due to reasonable cause; therefore, we sustain respondent's determinations. These additions are not applicable to the periods covered by the Internal Revenue Code of 1954. Section 6653(d), I.R.C. 1954. Lydon with Crost Petitioner's relationship with Crost was of a different nature than with Hodge. Crost was a subcontractor for Lydon's companies and, as such, his company was dependent upon petitioner for a good deal of business. The Crost company performed work on the various state jobs for Mitchell-David, with Crost and Lydon handling the arrangements for their respective companies. In these dealings Lydon was the dominant party. After having success in his peculations of state funds through the issuance of fictitious vouchers, petitioner apparently realized that he could benefit even more from the state contracts if he could obtain raised invoices from a supplier and pocket the amount by which the state payments exceeded his actual cost. To this end he approached Crost and, using his dominant position as a substantial buyer from the Crost company, asked Crost to raise some invoices and "kick back" part of the proceeds received in payment from Mitchell-David. Crost acquiesced, cashed Mitchell-David checks, and turned back to Lydon proceeds for services *349 which his company had not performed. The clearest instance of the pattern followed by these transactions is afforded by Crost's raised bids of May 24, 1953. Lydon prepared the two sets of bids in his own handwriting on a sheet of notebook paper. Crost charged Lydon the lower amount while Lydon used the higher amount in billing the state. The deposit slips bearing Crost's notations further document Lydon's dealings with Crost. In order to have a record of the amounts he turned back to Lydon, Crost subtracted these amounts from the amount of the Mitchell-David payments he had received and deposited the remaining sum in the Crost company account. If the amount turned back by Crost represented work done by the Crost company, Lydon would cause a further check to be issued to reimburse Crost. The additional amount paid by Mitchell-David was then charged off as a business expense. Thus Lydon benefited from both ends of his transactions with Crost. He was able to pocket the money turned back to him by Crost while at the same time using the raised Crost company invoices as a basis for his ten percent profit from the state. Petitioner failed to report these amounts as income, resulting in further *350 underpayments in the years involved here. When petitioner left Mitchell-David, his stock was redeemed by the company. On his 1954 income tax return, Lydon reported a long-term capital gain of $1,677. In arriving at this figure he used a sale price of $25,000 and a basis of $19,410, for a gain of $5,590, of which he reported the $1,677 as an installment sale payment. He included as part of his basis in the stock $2,000 which he claimed he was obligated to pay as a guarantor of a Mitchell-David lease in the Merchandise Mart. He also deducted $565 from the sale price as legal expenses of collecting the sale price from the corporation. Petitioner's use of $25,000 as the sale price was incorrect. This represents only the cash amount he was to receive; his receipt of the company Oldsmobile and various accounts receivable should likewise have been included. Petitioner's use of the installment method of reporting his gain was similarly incorrect. Petitioner has admitted receiving at least $9,000 in cash plus the automobile, worth $2,100, in 1954. This would foreclose his use of the installment method of reporting, because section 453(b)(2)(ii) of the Internal Revenue Code of 1954 limits use *351 of this method to situations where the payments in the first year "do not exceed 30 per cent of the selling price." Under either petitioner's or respondent's calculation of the selling price, petitioner's sale does not qualify for this treatment. Petitioner claims that the cost of his Mitchell-David stock was $15,535, but he offers only his own testimony to support this figure. He offers no explanation of this amount, nor does he document it in any way. There is no evidence that petitioner's basis was any greater than determined by the respondent, and on this issue the respondent is sustained. In 1955 petitioner paid $2,000 as a guarantor of Mitchell-David obligation on Interiors' lease at the Merchandise Mart when Mitchell-David became insolvent. Petitioner argues that he should thereby be entitled to increase his basis in his Mitchell-David stock by that amount. He cites no authority in support of this contention and we can find none. While petitioner is incorrect in his treatment of this item, he may deduct the amount as a bad debt under section 166(d) of the Internal Revenue Code of 1954. Putnam v. Commissioner, 352 U.S. 82 (1956). Petitioner's guarantee was an individual guarantee *352 made as president and shareholder of Mitchell-David, one of the participants in Interiors. Mere participation in a business is not sufficient to create a "business" debt. The guarantee was a personal guarantee of the corporate obligation. Since petitioner makes no claim that he was engaged in a trade or business of making loans or guarantees or of organizing, promoting or financing the Mitchell-David business, we find that this is a nonbusiness bad debt under section 166(d)(2) of the 1954 Code, and may be deducted only as a short-term capital gain under section 166(d)(1)(B) of the 1954 Code. Charles G. Berwind, 20 T.C. 808 (1953), affd. per curiam 211 F. 2d 575 (C.A. 3, 1954).ion on Interiors' lease at the Merchandise Mart when Mitchell-David became insolvent. Petitioner argues that he should thereby be entitled to increase his basis in his Mitchell-David stock by that amount. He cites no authority in support of this contention and we can find none. While petitioner is incorrect in his treatment of this item, he may deduct the amount as a bad debt under section 166(d) of the Internal Revenue Code of 1954. Putnam v. Commissioner, 352 U.S. 82 (1956). Petitioner's guarantee was *353 an individual guarantee made as president and shareholder of Mitchell-David, one of the participants in Interiors. Mere participation in a business is not sufficient to create a "business" debt. The guarantee was a personal guarantee of the corporate obligation. Since petitioner makes no claim that he was engaged in a trade or business of making loans or guarantees or of organizing, promoting or financing the Mitchell-David business, we find that this is a nonbusiness bad debt under section 166(d)(2) of the 1954 Code, and may be deducted only as a short-term capital gain under section 166(d)(1)(B) of the 1954 Code. Charles G. Berwind, 20 T.C. 808 (1953), affd. per curiam 211 F. 2d 575 (C.A. 3, 1954). See also Trust of Bingham v. Commissioner, 325 U.S. 365 (1945). Petitioner's calculations of the amount received for his Mitchell-David stock are equally unclear. On his 1954 return, petitioner reported a sale price of $25,000. On brief he concedes that he should have included the value of the Oldsmobile automobile ($2,100) and of certain disputed credits. Petitioner has introduced no evidence to show the value of these credits. Consequently, we accept respondent's calculation that *354 the sale price totaled $31,446.84. Petitioner claimed as a deduction from the sale price in 1954, the amount of $565, which he incurred as legal fees in 1955 in attempting to collect the sale price. Again petitioner cites no authority for such treatment, and we find none. He may, however, deduct this amount in 1955 as an ordinary and necessary expense incurred for the collection of income under section 212(1) of the 1954 Code. See Frank T. Feagans, 23 T.C. 208 (1954), and Trust of Bingham v. Commissioner, supra. It is not, however, permissible for him to deduct it from the sale price reported in 1954. Respondent disallowed $3,293.96 of petitioner's claimed "other business deductions" in 1955. While petitioner introduced his cancelled checks covering these items, he has failed, except with regard to $656 of expenses incurred on a selling trip, to show that any of these expenses were ordinary, necessary and related to his trade or business. We therefore sustain the respondent's determination except for the $656 amount, which is allowable under section 162(a)(2) of the 1954 Code. In his notice of deficiency respondent included the amount of $281.24 as interest received by petitioner *355 from Mitchell-David pursuant to the contract covering the redemption of petitioner's stock. Petitioner has failed to present evidence on this point except for a vague explanation that he did receive interest payments but that they were allocated by a bookkeeper to a "principal account." We therefore sustain respondent's determination. Depreciation deductions of $300 in 1954 and $250 in 1955 were disallowed by respondent. We reject petitioner's contention that these findings were arbitrary and capricious, and since petitioner has introduced no evidence on these points, we sustain respondent's determinations. Decision will be entered under Rule 50. Footnotes1. This latter amount was stipulated by the parties to be $15,232.45 but the warrant and supporting voucher show it as $15,232.48. The discrepancy is immaterial here since this item is not in dispute.↩*. Items in dispute here↩2. SEC. 294. ADDITIONS TO THE TAX IN CASE OF NONPAYMENT. * * *(d) Estimated Tax. - (1) Failure to file declaration or pay installment of estimated tax. - (A) Failure to file declaration. - In the case of a failure to make and file a deciaration of estimated tax within the time prescribed, unless such failure is shown to the satisfaction of the Commissioner to be due to reasonable cause and not to willful neglect, there shall be added to the tax 5 per centum of each installment due but unpaid, and in addition, with respect to each such installment due but unpaid, 1 per centum of the unpaid amount thereof for each month (except the first) or fraction thereof during which such amount remains unpaid. In no event shall the aggregate addition to the tax under this subparagraph with respect to any installment due but unpaid, exceed 10 per centum of the unpaid portion of such installment. * * *